LAW OFFICES OF
# Murray Richman
2027 Williamsbridge Rd. Bronx, NY 10461
(718) 892-8588 • Fax (718) 518-0674

April 7, 2005

By Fax and ECF
Honorable Raymond J. Dearie
United States District Court Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                                      Re:    ***U.S. v. Venero Mangano***
                                                Docket No. 90-CR-446-4

Dear Judge Dearie:

      As per the Court's invitation, this letter is submitted in support of our January 21, 2005 letter and March 22, 2005 oral application for a ruling pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure.

### Rule 60(b)(6) Gives this Court Legislative Jurisdiction and the Discretionary Power to Revisit Venero Mangano's Sentencing Issue

      It is the defendant's position that this Court has legislative "jurisdiction" and the "discretionary power to revisit the sentencing issue under Rule 60(b)(6)" of the Federal Rules of Civil Procedure (hereinafter "Fed. R. Civ. P."). The Tenth Circuit has described Rule 60(b)(6) as a "grand reservoir of equitable power to do justice in a particular case." See, Cashner v. Freedom Stores, Inc., 98 F.3d 572, 579 (10th Cir. 1996). This Court, however, "may grant a Rule 60(b)(6) motion only in extraordinary circumstances and only when necessary to accomplish justice." Id. (further citations omitted). The Tenth Circuit has found such extraordinary circumstances to be present, for example, when, after entry of judgment, "events not contemplated by the moving party render enforcement of the judgment inequitable." Id. (citing Zimmerman v. Quinn, 744 F.2d 81, 82-83 (10th Cir. 1984) and State Bank v. Gledhill, 76 F.3d 1070, 1081 (10th Cir. 1996) as illustrative examples).

      To that end, a district court may set aside a judgment for "any other reason justifying relief from the operation of the judgment." Fed. R. Civ. P. 60(b)(6). However, relief under this "catch-all" provision is available "only if extraordinary circumstances are present." Hess v. Cockrell, 281 F.3d 212, 216 (5th Cir. 2001), quoting Bailey v. Ryan

LAW OFFICES OF
# Murray Richman

Stevedoring Co., Inc., 894 F.2d 157, 159 (5th Cir. 1990); see also Ackermann v. United States, 340 U.S. 193, 199 (1950); United States v. Cirami, 563 F.2d 26, 32 (2d Cir. 1977).

As delineated in my oral application, on March 22, 2005, the United States Supreme Court held that "a court may exercise its discretionary power under [Rule 60(b)(6)] whenever appropriate to accomplish justice." Klapprott v. United States, 335 U.S. 601, 615 (1949). The Second Circuit has called the provisions of Rule 60(b)(6) "especially broad" given the Supreme Court's holding in *Klapport*. See, International Controls Corp v. Vesco, 556 F.2d 665 670 (2d Cir. 1977).

A motion pursuant to Rule 60(b)(6) is appropriately invoked where the judgment may work an extreme and undue hardship to the movant. See, United States v. Karahalias, 205 F.3d 331, 333 (2d Cir. 1953); Nemaizer v. Baker, 793 F.2d 58, 63 (2d Cir. 1986)(holding that movant must show "extraordinary circumstance justifying relief" or "extreme and undue hardship"); Cahill v. Arthur Anderson & Co., 659 F.Supp. 1115, 1129 (S.D.N.Y. 1986)(same).

The Second Circuit has also recognized that the "extraordinary circumstances" and the "extreme and undue hardship" clauses of Rule 60(b)(6) are only available when the provisions under Rule 60(b) (1) thru (5) are, as in the case *sub judice*, inapplicable. See, Matter of Emergency Beacon Corp., 666 F.2d 754, 758 (2d Cir. 1981).

It is understood that the Federal Rules of Civil Procedure govern only the procedure in the United States District Courts for suits of a civil nature. Fed R. Civ. P. And, specifically, that Rule 60(b) does not provide relief from a judgment in a criminal case. The rule is only available with respect to a previous habeas proceeding when the motion challenges the integrity of the habeas proceeding. Thus, we recognize that the rule cannot be used to attack the underlying criminal conviction. See, Harris v. United States, 367 F.3d 74, 77 (2d Cir. 2004).

However, contrary to the erroneous position undertaken by the government in their response to our January 21, 2005 letter, this Court can entertain our application without having to consider whether the defendant's Rule 60(b)(6) motion operates as a successive petition. The Second Circuit dealt with a similar situation in Rodriguez v. Mitchell, 252 F.3d 191 (2d Cir. 2001). To be sure, the Rodriguez Court explained its conclusion that a Rule 60(b) motion is not a second or successive habeas petition, and thus not barred by the strictures of the AEDPA, by stating the following:

LAW OFFICES OF
# Murray Richman

> A motion under Rule 60(b) and a petition for habeas have different objectives. The habeas motion under 28 U.S.C. § 2254 seeks to invalidate the state court's judgment of conviction. As to the motion under Rule 60(b), while it is undoubtedly a step on the road to the ultimate objective of invalidating the judgment of conviction, it does not seek that relief. It seeks only to vacate the federal court judgment dismissing the habeas petition. The grant of such a motion would not have the effect of invalidating the state conviction. It would merely reinstate the previously dismissed petition for habeas, opening the way for further proceedings seeking ultimately to vacate the conviction. The fact that the Rule 60(b) motion contemplates ultimately the vacating of the conviction is shared with every motion the petitioner might make in the course of pursuing his habeas — motions to compel disclosure or quash the respondent's discovery demands, motions for extension of time to answer the adversary's motion, motions to be provided with legal assistance, motions for summary rejection of the respondent's contentions. All such motions, like the motion under Rule 60(b), seek to advance the ultimate objective of vacating the criminal conviction. But each seeks relief that is merely a step along the way. In our view, neither these motions, nor the motion under Rule 60(b) that seeks to vacate the dismissal of the habeas petition, should be deemed a second or successive petition within the meaning of 28 U.S.C. § 2244(b).

Rodriguez v. Mitchell, 252 F.2d at 198-199.

Here, owing to the fact that the instant application merely challenges the integrity of the previous Habeas Corpus proceeding, and not the conviction itself, this Court *absolutely* has jurisdiction to entertain the instant motion pursuant to Rule 60(b)(6).

### The Previous Habeas Corpus Proceeding Pursuant to 28 U.S.C. § 2255

Mr. Mangano filed a petition pursuant to 28 U.S.C. §2255 raising several claims. In particular, Mr. Mangano argued that the Court's upward departure of his sentence was improper where the basis of the Court's decision to upwardly depart beyond the statutory maximum of the Guidelines was predicated on hearsay evidence presented during a *Fatico*[1] sentencing hearing.[2] As this Court is fully aware the hearsay evidence consisted

---

[1] United States v. Fatico, 579 F.2d 707 (2d Cir. 1978).

LAW OFFICES OF
# Murray Richman

of an allegation that Mr. Mangano (and a codefendant) had participated in a scheme which included the authorization of the murder of potential witnesses against them.

Also raised in the petition was a Brady claim which was predicated on the government's failure to appraise the defense of the "foolish" allegations of government informant Alphonse D'Arco, where certain <u>unsubstantiated</u> improprieties were attributed to this Court. The Court is fully aware of those ridiculous allegations and thus the defendant need not reassert them here. However, it was Mr. Mangano's position that he was entitled to this information under the principles of Brady v. Maryland, 373 U.S. 83 (1963). The reviewing Judge found otherwise.

### The Integrity of the Habeas Proceeding Pursuant to 28 U.S.C. §2255

As stated, supra, the Second Circuit has held that a motion pursuant to Rule 60(b) must relate "to the integrity of the federal habeas proceeding, not the integrity of the ... criminal trial." Harris v. U.S., 367 F.3d 74, 80 (2d Cir. 2004); see also, Gitten v. U.S., 311 F.3d 529, 531-532 (2d Cir. 2002). Here, Mr. Mangano challenges the "integrity of the federal habeas proceeding" because the reviewing Judge improperly dismissed the sentencing issue as (a) *res judicata*, and (b) the Brady claim was viewed as "merely cumulative impeachment evidence lost among the myriad reprehensible activities which D'Arco had already admitted committing."

*The Sentencing Issue*

As a threshold matter, the specific sentencing issue Mr. Mangano raised in his habeas petition pursuant to 28 U.S.C. §2255 was not raised on appeal nor could it have been. The claims in the §2255 petition was predicated on Mr. Mangano's learning after both the *Fatico* hearing and sentencing that D'Arco had made outlandish allegations against the Court. Because this pertinent information was withheld from Mr. Mangano, he was unable to effectively assail D'Arco's credibility (and propensity to fabricate for his own selfish gain) during the *Fatico* hearing, and more importantly, at sentencing. This claim, in fact, was not raised on direct appeal (see generally, U.S. v. Gigante, 39 F.3d 42 (2nd Cir. 1994))(*see attached*). Furthermore, this specific claim could not be raised on direct appeal as it involved matters dehors the record. See e.g., U.S. v. Camejo, 929 F.2d 610 (11th Cir. 1991)(where the court "decline[d] to consider matters dehors the record."); see also Hassenflu v. Pyke, 491 F.2d 1094 (5th Cir. 1954)(holding that "it is inappropriate ... to base appellate opinion on assertions dehors the record")(emphasis added); United States v. Addonizio, 449 F.2d 100 (1st Cir. 1971)(court holding it "is

---

[2] Mr. Mangano was sentenced to 188 months, although his Guidelines range, with the included enhancements, was from 87-108 months.

LAW OFFICES OF
# Murray Richman

constrained not to consider matters *dehors* the record."). The specifics of this claim was properly brought via habeas corpus petition pursuant to 28 U.S.C. §2255.[3]

Thus, the integrity of the federal habeas corpus proceeding was impaired where the reviewing Judge failed to properly adjudicate this claim on the merits. Moreover, because proper adjudication of this claim could have resulted in a reduction in that aspect of the sentence which was upwardly departed beyond the statutory maximum, viz. from 188 to 87-108 months, it cannot be denied that, because the integrity of the federal habeas proceeding was contravened, the judgment has worked an extreme and undue hardship to Mr. Mangano. See, United States v. Karahalias, 205 F.3d 331, 333 (2d Cir. 1953); Nemaizer v. Baker, 793 F.2d 58, 63 (2d Cir. 1986)(holding that movant must show "extraordinary circumstance justifying relief" or "extreme and undue hardship"); Cahill v. Arthur Anderson & Co., 659 F.Supp. 1115, 1129 (S.D.N.Y. 1986)(same).

This Court has jurisdiction to reverse the Order which denied the federal habeas petition pursuant to 28 U.S.C. §2255.

### *The Brady Claim*

It was also averred in Mr. Mangano's §2255 petition that the government failed to alert defense counsel that D'Arco was somehow connected, directly or otherwise, to the "foolish" allegations which accused the Court of <u>unfounded</u> improprieties. The reviewing Judge disposed of this <u>Brady</u> claim as "merely cumulative." However, this valuable piece of information was "material" to issues raised at the *Fatico* hearing. Indeed, the way in which this claim was disposed of begs the question: How could this material evidence "not have … [a] persuasive effect on the fact-finder's assessment of D'Arco's credibility" when D'Arco was closely connected to the source of the unfounded allegations involving the Court? Given the fact-finder's personal experience with D'Arco's penchant for tall tales it cannot be gainsaid that defense counsel for Mr. Mangano could have convinced the Court that upward departure should not be predicated

---

[3] 28 U.S.C. § 2255, in pertinent part, states:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

LAW OFFICES OF
# Murray Richman

on the unfounded allegations – viz. the order to kill witnesses -- D'Arco attributed to Mr. Mangano.

28 U.S.C. §2255 permits a defendant to challenge the constitutionality of the imposed sentence, inter alia, on the grounds that,

> (1) the sentence was imposed in violation of the Constitution or laws of the United States, or
>
> (2) that the sentence was in excess of the maximum authorized by law, or
>
> (3) is otherwise subject to collateral attack

Mr. Mangano satisfied these provisions *in toto* and the reviewing Judge's disposal of these specific colorable claims in the manner that it did had the effect of undermining the integrity of the federal habeas corpus proceeding. Because the reviewing Judge's disposal of the aforementioned claims calls the integrity of the federal habeas corpus proceeding into serious question, Rule 60(b)(6) confers upon this Court the jurisdiction to relieve Mr. Mangano from the final judgment, consider the issues as specified herein anew, and grant the relief requested.

### *Undue Hardship on Mr. Mangano*

Mr. Mangano is 83 years old and is languishing in prison. Although the Court has been fully apprised of the serious health issues Mr. Mangano has dealt with throughout his entire incarceration, I will briefly reassert them here to underscore the undue hardship Mr. Mangano continues to deal with as a result of the breakdown in the integrity of his federal habeas proceeding.

In 1993 Mr. Mangano suffered a slight heart attack, which graduated to an elevated series of mild heart attack during and after the trial. In addition, doctors found that Mr. Mangano had an aorta aneurysm that was five centimeters and also found gall stones in Mr. Mangano's bladder. During his incarceration Mr. Mangano also underwent surgery to correct three blockages in his heart. Mr. Mangano also suffered an angina attacks. Also during his incarceration the aorta aneurysm reached a critical stage of seven centimeters. During all this time the aged defendant was bused back and forth between Butner and Rochester federal prisons. Mr. Mangano also suffers from the very serious eye condition, macular degeneration.

# LAW OFFICES OF
# Murray Richman

The undue hardship brought to bear on Mr. Mangano is apparent. He is a very sick man who is in threat of losing his eyesight. Rule 60(b)(6) anoints this Court with a "grand reservoir of equitable power" and "broad discretion" to relieve Mr. Mangano from the final judgment. If there were ever a case where "extraordinary circumstances" are apparent it is this one here. Mr. Mangano was not delivered a death sentence – he was sentenced to 188 months. Yet, given his grave conditions, Mr. Mangano's sentence *may* turn out to be, if not a literal death sentence, a severely debilitating one.

### *Bail Pending the Outcome of the Proceeding*

In our January 21, 2005 letter we asked for bail on behalf of Mr. Mangano. The Court advised counsel, and correctly so, that it could not consider bail without the instant petition being filed. The petition is now so filed and the Court is once again called upon to consider bail for Mr. Mangano pending the outcome of these proceedings. The Court has stated that it is "enormously sympathetic to the family and to Mr. Mangano, his declining years." The Court now has an opportunity to invoke its broad discretionary powers and, in the interest of justice, grant both the instant Rule 60(b)(6) and bail applications.

We respectfully assert that a colorable claim has been made, jurisdiction has been demonstrated, and Mr. Mangano should be granted the relief sought herein.

### *Conclusion*

As stated on March 22, 2005, during oral discussion, it is our position that the Court does have jurisdiction to entertain the instant application under the principles of Rule 60(b)(6) of the Federal Rules of Civil Procedure and the case authority – cited herein – which has interpreted its provisions. The reviewing Judge's handling of the above claims impaired the integrity of the federal habeas corpus proceeding. Because this Rule 60(b)(6) application "relates to the integrity of the federal habeas proceeding, not the integrity of the ... criminal trial," Harris v. U.S., 367 F.3d at 80, this Court has jurisdiction to act in a manner not inconsistent with the interest of justice.

Respectfully submitted,

MURRAY RICHMAN, ESQ
2027 Williamsbridge Road
Bronx, New York 10461
(718) 892-8588

# LAW OFFICES OF
# Murray Richman

cc: Peter A. Norling
Assistant U.S. Attorney
Eastern District of New York
147 Pierrepont Street
Brooklyn, NY 11201

Venero Mangano (03508-054)
FCI Butner
P.O. Box 999
Old Hwy 75
Butner, NC 27509

U.S. v. GIGANTE, *39 F.3d 42* (2nd Cir. 1994)

UNITED STATES OF AMERICA, APPELLEE, v. VINCENT GIGANTE, ALSO KNOWN AS "CHIN"; VITTORIO AMUSO, ALSO KNOWN AS JESSE, ALSO KNOWN AS VIC; ANTHONY CASSO, ALSO KNOWN AS GAS, ALSO KNOWN AS GASPIPE; PETER GOTTI; DOMINIC CANTERINO, ALSO KNOWN AS BALDY DOM; PETER CHIODO; JOSEPH ZITO; CAESAR GURINO; VINCENT RICCIARDO, ALSO KNOWN AS THREE FINGERS; JOSEPH MARION, ALSO KNOWN AS JOE CAKES; JOHN MORRISSEY, ALSO KNOWN AS SONNY BLUE, ALSO KNOWN AS SONNY; THOMAS McGOWAN; VICTOR SOBOLEWSKI; ANTHONY B. LAINO; GERALD CONSTABILE; ANDRE CAMPANELLA; MICHAEL REALMUTO; GEORGE ZAPPOLA; RICHARD PAGLIARULO; MICHAEL DeSANTIS; MICHAEL SPINELLI; THOMAS CAREW; AND CORRADO MARINO, DEFENDANTS, VENERO MANGANO, ALSO KNOWN AS BENNY EGGS; BENEDETTO ALOI, ALSO KNOWN AS BENNY; AND DENNIS DeLUCIA, DEFENDANTS-APPELLANTS.

Nos. 381 to 383, Dockets 93-1260, 93-1277 and 93-1278.

United States Court of Appeals, Second Circuit.

Argued October 25, 1993.

Decided October 24, 1994.

**Page 43**

[EDITORS' NOTE: THIS PAGE CONTAINED HEADNOTES AND HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]

**Page 44**

Gregory J. O'Connell, Asst. U.S. Atty. (Zachary Carter, U.S. Atty., and David C. James, Charles E. Rose, and Kevin P. McGrath, Asst. U.S. Attys., E.D.N.Y., of counsel), for appellee.

Judd Burstein, New York City (Marc Fernich, New York City, of counsel), for defendant-appellant Aloi.

Frederick P. Hafetz, Goldman & Hafetz, New York City (Susan R. Necheles and Adam Thurschwell, Goldman & Hafetz, New York City, of counsel), for defendant-appellant Mangano.

Alan Futerfas, Shargel & Futerfas, New York City, for defendant-appellant DeLucia.

Before: VAN GRAAFEILAND and WINTER, Circuit Judges, and POLLACK, District Judge.[fn*]

[fn*] The Honorable Milton Pollack, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

WINTER, Circuit Judge:

[1] Venero Mangano, Benedetto Aloi, and Dennis DeLucia appeal from their convictions by a jury before Judge Dearie for extortion and conspiracy to commit extortion in violation of 18 U.S.C. §§ 2 and

1951. The principal issue on this appeal arises from the facts that Mangano and Aloi had, after conviction, a base offense level that would have resulted in sentences of 27-33 months under the Guidelines, whereas, after adjustments in the levels and upward departures, many of which were based on uncharged or acquitted conduct, Mangano was sentenced to 188 months, and Aloi to 200. In calculating Mangano's and Aloi's sentences, Judge Dearie granted the government's motion for an upward departure, pursuant to U.S.S.G. § 5K2.0, from the sentencing range established in the United States Sentencing Guidelines on the basis of conduct for which Mangano and Aloi were not convicted. Mangano and Aloi appeal the upward departure as unreasonable, as based on other erroneous grounds, and as based on the wrong standard of proof. They further argue that the indictment underlying their convictions was legally improper and challenge their sentences for an improper calculation of the "amount demanded" by the extortion conspiracy. DeLucia, who was sentenced to 46 months, joins in his co-defendants' appeals of their convictions and presses his own argument that the evidence against him was legally insufficient and that his sentence was based on an erroneous calculation of the "amount demanded." We reject all these arguments and affirm.

[2]                         BACKGROUND

[3] We view the evidence in the light most favorable to the government. Mangano and Aloi were senior members of the administration of the Genovese and Colombo crime organizations, respectively. Beginning in 1978, they participated in a lucrative conspiracy to control the window replacement market in the New York metropolitan area, primarily through controlling the bidding on contracts with the New York City Housing Authority ("NYCHA"). DeLucia, a senior or "made" member of the Colombo organization, joined the conspiracy in 1988. Through threats and acts of violence against window manufacturers, and through influence over a corrupt labor union, Local 580 of the Architectural and Ornamental Ironworkers Union ("Local 580"), responsible for supplying workers on window replacement contracts, Mangano, Aloi, DeLucia, and their associates managed to rig many of the bids on those contracts, thus inflating the costs to the NYCHA. They then collected payments from the manufacturers.
**Page 45**

[4] Mangano, Aloi, and DeLucia were convicted for the extortion of, and conspiring to extort, the window manufacturer Graham Architectural Products, Inc. ("Graham"). A manufacturer and supplier of windows to installers controlled by the conspirators, Graham attempted to bid for window installation contracts itself in 1982. Under direct threats from the conspirators and from Local 580 and other unions, Graham temporarily ceased to bid. In March 1985, Graham attempted yet again to submit competitive bids but was once more thwarted by the conspirators' threats and pressure on installers. Further attempts by Graham to escape the conspirators' control led it to seek new installers, only to discover that they too were controlled by organized crime families, including the Gambino organization.

[5] The conspirators frequently quarreled over which crime family would garner the profits from control of Graham. Mangano stated at a 1988 meeting that, "I feel Graham was mine from the beginning." Nonetheless, all the conspirators agreed to exert control over Graham. For instance, at a meeting in June 1989, attended by all the major conspirators, the conspirators and Savino discussed their policy of thwarting Graham's efforts to bid independently.

[6] The conspirators were clearly aware of the illegality of their actions. Both DeLucia and Aloi counseled their co-conspirators not to mention names, especially over the telephone. In

discussing another co-conspirator, Mangano instructed Peter Savino, a government informant, to "[m]ake sure he ain't wired." Mangano warned the others to establish ostensibly legal rationalizations for their actions, "The rest has gotta be done [so] that when somebody comes with a microscope they gonna look at it, yous done everything legal and alright. No more of this fucking shit that you did over here." Aloi voiced his fear of apprehension, lamenting, "I don't want to go to jail for a hundred years." Finally, upon discovering that many of their incriminating conversations had been secretly recorded by Savino, one conspirator threatened Savino and told him, "You were seen with federal agents, rat mother-fucker."

[7] Although a latecomer to the conspiracy, DeLucia was instrumental in its execution. DeLucia, an assistant to Aloi, appeared at almost every meeting attended by Aloi and demonstrated his knowledge of and complicity in the scheme. DeLucia thus revealed a grasp of the details of the conspiracy, including the arrangements for payments from the contractors and the planning of crucial meetings among the conspirators. DeLucia set the stage for the key discussion of the suppression of competitive bids through union intervention at the "heavyweights" meeting of February 24, 1989, when he stated, "The reason for this meeting is this guy's gotta throw in . . . Sonny's gotta make this guy throw in back his bid so you wind up with it. . . ."

[8] The conspirators were indicted on sixty-nine counts of RICO violations and the underlying extortion, mail fraud, and labor payoff crimes. At trial, Savino, a former associate of the Genovese crime organization, testified extensively about the conspiracy and verified secretly recorded conversations amongst the conspirators that had taken place over eighteen months in 1988 and 1989. The government also introduced the testimony of Russell Trout, the former president of Graham, who recounted the pressure from the conspirators to cooperate with the conspiracy. Peter Chiodo, a former captain in the Luchese crime family, testified regarding the bidding conspiracy, the extortionate exclusion of competitors, and the collection of pay-offs from window manufacturers. Mangano, Aloi, DeLucia, and the crime families they represented, figured prominently in all of this testimony.

[9] Mangano, Aloi, and DeLucia were convicted on Counts 3 (conspiracy to commit Hobbs Act extortion) and 59 (Hobbs Act extortion) of the 69-count indictment. The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Count 59 charged the defendants with acts of extortion, referenced in Racketeering Act 84, in obtaining from Graham with its consent and by the wrongful use of fear its property.
**Page 46**
This property consisted of its right to bid competitively and contract freely for window installation contracts. Racketeering Act 84 set out two acts of extortionate conduct:

    a. The causing of window installation companies to refuse to contract for the installation of Graham windows in NYCHA projects; and

    b. The causing of Graham, its owners, officers and employees to fear economic injury by threatening to prevent and preventing the installation of Graham windows in NYCHA projects.

[10] At a *Fatico* sentencing hearing, see *United States v. Fatico,* 579 F.2d 707 (2d Cir. 1978), the government presented

evidence that Mangano and Aloi conspired to murder potential witnesses following the revelation in 1989 that Savino had secretly taped the conspirators' conversations for eighteen months. Peter Chiodo, a captain in the Luchese crime family, had testified at trial that he had murdered John "Sonny" Morrissey on orders from the conspirators. After his guilty plea, Chiodo himself became the victim of the murder conspiracy and was shot twelve times in an unsuccessful attempt on his life. At the *Fatico* hearing, the government also presented several other witnesses who testified that further murders had been planned but that those plans were suspended to increase the defendants' chances for release on bail.

[11] At sentencing, the parties agreed that the applicable base offense level pursuant to U.S.S.G. § 2B3.2 was eighteen. The district court then increased Mangano's and Aloi's sentences seven levels, pursuant to U.S.S.G. § 2B3.1(b)(6)(h), based on the greater than five million dollar loss inflicted as the "amount demanded." The court further increased their sentences, pursuant to U.S.S.G. § 3B1.1(a), based on the defendants' roles in the conspiracy, four levels for Mangano as a leader and three levels for Aloi as a "supervisor or manager." Finally, relying primarily on Mangano's and Aloi's participation in the murder conspiracy, the district court raised the offense levels by two for obstruction of justice pursuant to U.S.S.G. § 3C1.1, resulting in an offense level of 31 for Mangano and 30 for Aloi. Pursuant to U.S.S.G. § 5K2.0, the court granted an upward departure that corresponded to three levels in Mangano's case and five levels in Aloi's. Mangano received a sentence of 188 months, Aloi 200 months.

[12] The district court increased DeLucia's offense level from the original 18 by three levels to 21, pursuant to U.S.S.G. § 2B3.1(b)(6)(D), based on the "amount demanded" of $600,000, calculated as the difference between the rigged prices and competitive prices on a project re-bid after the indictment. This rendered a sentence of 46 months for DeLucia.

[13]                                    DISCUSSION

[14] 1. *The Upward Adjustments and Departures*

[15] Mangano and Aloi argue that the district court erred in adjusting the base offense levels and departing substantially upward from the Guidelines' suggested sentencing range based on conduct for which they had not been convicted. To support this argument they invoke the Supreme Court's suggestion of undefined "constitutional limits" on the extent a State's sentencing framework may entail upward departures based on unconvicted conduct lest that become "the tail which wags the dog of the substantive offense." *McMillan v. Pennsylvania*, 477 U.S. 79, 86-88, 106 S.Ct. 2411, 2416, 91 L.Ed.2d 67 (1986). Mangano and Aloi rely upon our decision in *United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992), *cert. denied*, ___ U.S. ___, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993), in challenging both the practice of departing upward based on uncharged or acquitted conduct, and the standard of proof used by the district court in assessing that conduct for sentencing.

[16] Mangano and Aloi contend that the district court improperly required proof of the unconvicted conduct by a mere preponderance of the evidence rather than by clear and convincing evidence. They rely on a statement in a separate opinion in *Concepcion* that, "a strong argument can be made that the `clear and convincing evidence' standard should be used, at least for substantial enhancements." *Id.* at 394 (Newman, J., concurring). They further echo Chief Judge

**Page 47**

Newman's request for a review of this issue by the full court of

this circuit. *Id.* at 395-96 (Newman, J., dissenting from denial of rehearing in banc).

[17] As noted in both the opinion of the court and Chief Judge Newman's opinion in *Concepcion,* proof of unconvicted conduct by a preponderance of the evidence is a sufficient threshold basis for an upward departure. *Id.* at 390, 394. *Concepcion,* however, did not rely upon the preponderance standard because the district court had established the relevant conduct by clear and convincing evidence. *Id.* at 390. In the instant matter, Judge Dearie stated that he had "concluded that the credible evidence before the Court, in a variety of forms and formats, has established by at least a preponderance of the evidence that defendants Mangano and Aloi were members of a conspiracy to murder witnesses. . . ." Judge Dearie correctly understood the law of this circuit to be that unconvicted conduct may be relied upon to adjust a defendant's sentence level as contemplated by the Guidelines based on proof by a preponderance of the evidence. *United States v. Rodriguez-Gonzalez,* 899 F.2d 177, 182 (2d Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990); *United States v. Weinberg,* 852 F.2d 681, 685 (2d Cir. 1988).

[18] In arguing that the extent of the departure was erroneous, Mangano and Aloi contrast the 27 to 33-month sentences indicated by the base offense level of 18 with Mangano's actual sentence of 188 months and Aloi's sentence of 200 months. They contend that this increase, based in part on acquitted conduct, violated their rights to due process under the Fifth Amendment.

[19] Appellants' argument is not without force. The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses. *See United States v. Fatico,* 458 F. Supp. 388, 403 (E.D.N.Y. 1978), *aff'd,* 603 F.2d 1053 (2d Cir. 1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980) ("Quantified, the preponderance standard would be 50+ % probable."); *see also Nissho-Iwai Co. v. M/T Stolt Lion,* 719 F.2d 34, 38 (2d Cir. 1983); Leonard B. Sand et al., Modern Federal Jury Instructions ¶ 73.01 at 73-6 (1993). Appellants' constitutional argument is that such a low standard of proof should not serve as the basis for finding facts that then serve to increase sentences through adjustments or departures by substantial amounts, particularly when the conduct is uncharged or has previously resulted in an acquittal. They argue that a higher standard of proof, such as clear and convincing evidence, ought to apply.

[20] Although we agree that there is a constitutional requirement of some rough proportionality between the weight of the evidence of the uncharged conduct and the degree of adjustment or departure — and believe the Guidelines so provide for reasons stated *infra* — we do not agree with appellants' solution. Certainly, the danger of factual error would permeate a substantial upward departure based on a finding of, say, six uncharged crimes, each of which was proven only by a bare preponderance. *See* Edwin Mansfield, Statistics for Business and Economics 102 (5th ed. 1994). The Guidelines are silent as to the requisite burden, however, and we have followed the pre-Guidelines *Fatico* decision that factual issues need be proven only by a preponderance. *United States v. Guerra,* 888 F.2d 247, 251 (2d Cir. 1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). Of course, in the pre-Guidelines era, the extent of judicial discretion was such that the sentence might be ratcheted in a rough way upward or downward according to the weight of the evidence of uncharged or acquitted conduct. Indeed, a court had discretion to disregard such evidence entirely, even if proven. *See Fatico,* 579 F.2d at 713 n. 14. Under those

circumstances, however, it was probably understood that the weight of the evidence of uncharged or acquitted conduct could be factored into the final sentence. A court thus also had the power to impose a very long sentence within the statutory maximum based on that uncharged conduct. *United States v. Fischer,* 381 F.2d 509, 511 (2d Cir. 1967), *cert. denied,* 390 U.S. 973, 88 S.Ct. 1064, 19 L.Ed.2d 1185 (1968); *United States v. Bowdach,* 561 F.2d 1160, 1175 (5th

**Page 48**

Cir. 1977); *United States v. Hodges,* 556 F.2d 366, 369 (5th Cir. 1977), *cert. denied,* 434 U.S. 1016, 98 S.Ct. 735, 54 L.Ed.2d 762 (1978).

[21] Courts have less discretion as to the range of sentences under the Guidelines. Moreover, in some situations it is mandatory under the Guidelines that they take uncharged conduct into account. *See United States v. Telesco,* 962 F.2d 165, 168 (2d Cir. 1992); *United States v. Vazzano,* 906 F.2d 879, 882 (2d Cir. 1990); U.S.S.G. § 1B1.3, comment. (backg'd.). Nevertheless, we believe that the preponderance test continues to govern. *United States v. Rivalta,* 892 F.2d 223, 230 (2d Cir. 1989). However, that test provides no more than a threshold basis for adjustments or departures, and we believe that the weight of the evidence is at some point a factor to be considered by a court with regard to both adjustments and upward departures.

[22] With regard to adjustments, we believe that a district judge would be entitled to depart downward when faced with a situation in which a series of adjustments, each of which involves conduct proven by a bare preponderance, leading to substantial enhancement. The magnitude of the possibility of factual error increases as each adjustment is added to the base offense level. A district judge convinced that the weight of the factual record and ultimate sentence are substantially misaligned would be entitled to conclude that the Commission had not taken this into account and to depart downward. *See United States v. Restrepo,* 936 F.2d 661, 666 (2d Cir. 1991); *United States v. Cotto,* 793 F. Supp. 64, 67 (E.D.N.Y. 1992); *United States v. Yellow Earrings,* 891 F.2d 650, 654 (8th Cir. 1989). We face no such situation in the instant matter, however. The adjustments for amount of loss, see *infra,* role in the offense, and obstruction of justice were based on overwhelming evidence.

[23] With regard to upward departures, they must be reasonable. *United States v. Stephenson,* 921 F.2d 438, 441 (2d Cir. 1990); *United States v. Palta,* 880 F.2d 636, 639 (2d Cir. 1989). Indeed, defendants may appeal on the ground that a departure is unreasonable. 18 U.S.C. § 3742(e)(3). We find it difficult to believe that a district judge who had to resort to a tie-breaking rule to find facts justifying an upward departure would actually depart in any substantial way. We also believe that an appellate court would and should take the weight of the evidence into account in reviewing the reasonableness of a departure.

[24] The present case nicely illustrates the process. Judge Dearie began by stating that Mangano and Aloi had been shown by "at least a preponderance of the evidence" to have conspired to murder the witnesses. Noting that this was not a matter to be taken "lightly," Judge Dearie proceeded to analyze the testimony of the witnesses who implicated Mangano and Aloi in the conspiracy and why he found them credible. He then concluded, as do we, that the evidence was "compelling." Appellants' due process rights were thus not violated.[fn1]

**Page 49**

[25] 2. *Validity of the Indictment*

[26] Mangano, Aloi, and DeLucia ask for a new trial on the ground that Count 59 failed to state properly the indicted offense of Hobbs Act extortion and that Count 3 charging conspiracy was therefore also invalid. The indictment charged that Graham had been extorted of its property right to contract freely with window installers with Graham's consent. The defendants contend that Graham could not have been extorted since, under the Hobbs Act, extortion requires the consent of the victim through force or fear. Under their theory, Graham had no need to consent to the deprivation of its right to contract freely since the defendants presented the company with a fait accompli. Rather than being extorted, they argue, Graham was merely robbed. *See People v. Hagen,* 212 A.D. 879, 208 N.Y.S. 235 (App. Div. 1925) (holding that taking of money by physical force is not extortion). Moreover, they claim, even if Graham did fear harm, that fear did not prompt any action relevant for Hobbs Act purposes because Graham's consent was superfluous. Because the jury convicted on Count 59 on the basis of the allegedly defective "right to contract with installers" charge, appellants argue that the entire count must fail and be remanded for a new trial.

[27] Even assuming that their legal arguments are correct, these arguments fail on factual grounds because "the causing of window installation companies to refuse to contract," is not the same as causing *all* installation companies to refuse to contract. The evidence at trial showed that some installers remained beyond the conspirators' control. So long as the possibility existed that Graham might contract with some other installer, the defendants' conduct, in causing some installers to refuse to contract with Graham, was an extortionate use of economic pressure aimed at causing Graham to cease its attempts at competitive bidding.

[28] 3. *Sufficiency of the Evidence Against DeLucia*

[29] DeLucia argues that the government adduced insufficient evidence to support his conviction. The evidence must of course be viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and, if any rational jury could have found the essential elements of the crime, the conviction must be sustained. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Chang An-Lo,* 851 F.2d 547, 554 (2d Cir.), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). DeLucia claims he was "extraordinarily ignorant" of the window installation conspiracy, pointing to several statements made during a key meeting of the conspirators on February 24, 1989. However, these statements, such as "I'm starting to learn all this now," and questions such as, "We're not the union . . . that installs windows?" are ambiguous at best. They hardly amount to denials of involvement and are belied by DeLucia's own affirmative answer in responding to the question from a member of the Gambino crime family: "You know everything that's going on, right?" The record was thus sufficient to allow the jury to find that DeLucia was thus a "knowing participant" in the conspiracy. *United States v. Young,* 745 F.2d 733, 763 (2d Cir. 1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).

[30] 4. *Amount of Loss*

[31] Mangano and Aloi challenge the calculation of the $5 million "amount demanded" on which basis the district court made a seven-level increase in their sentencing offense levels pursuant to U.S.S.G. § 2B3.2(a). DeLucia challenges the same calculation on the basis of the $734,000 portion of that amount attributable to the period of his participation in the window installation conspiracy. The district court defined the "amount demanded" for sentencing purposes as the conspirators' "ill-gotten gains," calculated as roughly 10% of the amount of the conspirators'

successful bids for NYCHA contracts. Judge Dearie based this figure on the difference
**Page 50**
between the withdrawn bid on the Unity Plaza project and the conspirators' rigged bid ($634,000) and on Trout's affidavit estimating the gross profits from NYCHA contracts.

[32] Appellants claim that there was no "amount demanded" because there was no loss to Graham as the victim of the conspiracy, and that Graham in fact profited from its participation in the bid rigging. Appellants also assert that the evidence was insufficient to support the calculated amount. These arguments ignore that Graham was neither the sole "victim" nor the sole beneficiary of the conspiracy. The NYCHA lost millions of dollars by paying far higher than competitive prices for windows and their installation. That money did not just disappear. Although some went to Graham, most of the super-competitive portion went to the defendants.

[33] Moreover, the evidence presented by the government was fully sufficient to sustain these calculations. The evidence before the court indicated that the average gross margin on an NYCHA contract was 10%. The court adopted this figure to determine the "amount demanded." For several reasons, this was an extremely conservative method to use to arrive at such an estimate. If 10% was the average margin for rigged and honest bids, the profits from the rigged bids would be higher. For the same reasons, DeLucia is properly responsible for the share of these amounts incurred during the period of his participation in the conspiracy.

[34] 5. *Miscellaneous*

[35] Defendants argue that the imposition of a seven-level enhancement violates the Ex Post Facto clause since U.S.S.G. § 2B3.2(b)(1)(Nov. 1988) only called for a six-level enhancement under the Guidelines in effect at the time of the offense. *See United States v. Paccione,* 949 F.2d 1183, 1204 (2d Cir. 1991), *cert. denied,* ___ U.S. ___, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992). This argument is without merit. The defendants' offense extended beyond November 1, 1989, because the indictment issued on May 30, 1990. They were therefore properly sentenced under the November 1, 1989 Guidelines Section 2B3.1(b)(6)(H) specifying a seven-level increase. *United States v. Eisen,* 974 F.2d 246, 268 (2d Cir. 1992), *cert. denied,* ___ U.S. ___, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993) (conspirators correctly sentenced under November 1, 1987 Guidelines because conspiracy foreseeably extended beyond November 1, 1987).

[36] The reference to U.S.S.G. § 2B3.2(b)(4)(C) of the extortion guidelines which specifies a six-level increase for victims sustaining bodily injury was not improper as a basis for calculating the extent of the departure. Judge Dearie referred to the "threatening undertone of some level of violence" throughout the conspiracy and to the murders that were planned and committed in the wake of its exposure. Although a district court must explain the grounds for the departure, it need not articulate the precise provision relied on as a referent for the extent of the departure. *United States v. Cervantes,* 878 F.2d 50, 54 (2d Cir. 1989) ("[W]e do not require sentencing judges to `incant the specific language' used in the Guidelines.") (quoting *United States v. De Luna-Trujillo,*) 868 F.2d 122, 124 (5th Cir. 1989)).[fn2]

[37] We therefore affirm.

[fn1]

Mangano and Aloi contend that Judge Dearie erroneously included a "confluence of circumstances" involving organized criminal activity as an alternative basis for the upward departure from the Guidelines' recommended sentencing range. Judge Dearie mentioned the defendants' "status within their respective organizations, and their status within the bid rigging conspiracy, as opposed to the mere fact that they are members of organized crime groups," as well as the duration and extent of the conspiracy as factors constituting this "confluence." Mangano and Aloi argue that the Sentencing Commission already adequately considered these factors in calculating the Guidelines's ranges, that this departure impermissibly double counted factors taken into account in the three-level "role" adjustment, and that the court improperly calculated the extent of the departure based on U.S.S.G. § 2B3.2(b)(4)(C).

These arguments are meritless. Judge Dearie relied primarily on Mangano's and Aloi's participation in the murder conspiracy, "itself a valid basis, indeed a compelling basis, to depart upwardly." Judge Dearie explicitly ruled out departure solely on the basis of organized criminal activity, stating "I know of no authority . . . to enhance or increase or even upwardly depart on the sole basis of membership in an organized criminal activity." Instead, he pointed to Mangano's and Aloi's status within their respective crime families and within the conspiracy, in addition to the breadth and duration of the conspiracy, to justify an upward departure. These criteria do not "double count" the defendants' "leadership role" in the conspiracy since Judge Dearie could in any case depart upward from that calculation because leadership in the conspiracy is not the same as leadership in organized crime. Moreover, the Guidelines explicitly authorize upward departure on the basis of organized criminal activity. U.S.S.G. § 2B3.2, comment. (n. 8).

[fn2]

We do not consider Mangano's and Aloi's arguments based on the Supreme Court's decision in *Williams v. United States,* ___ U.S. ___, ___, 112 S.Ct. 1112, 1122, 117 L.Ed.2d 341 (1992). These arguments were raised for the first time in the defendants' reply brief. Arguments may not be made for the first time in a reply brief. *N.L.R.B. v. Star Color Plate Serv.,* 843 F.2d 1507, 1510 n. 3 (2d Cir.) (rejecting attempt to raise new issue in reply brief even though issue was raised in previous proceeding), *cert. denied,* 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 58 (1988); *see also Bendix Autolite Corp. v. Midwesco Enters.,* 486 U.S. 888, 895, 108 S.Ct. 2218, 2222-23, 100 L.Ed.2d 896 (1988) (refusing to evaluate an argument appellate court refused to consider because first raised in reply brief); *Lee v. Burkhart,* 991 F.2d 1004, 1010 n. 4 (2d Cir. 1993) (declining to consider plaintiff's allegation raised for first time in reply brief).

[38] VAN GRAAFEILAND, Circuit Judge, dissenting:

[39] To prove extortion under the *Hobbs Act,* the Government must prove that the defendant obtained "property from another, with his consent, induced by wrongful use of actual

Page 51

or threatened force, violence, or fear. . . ." 18 U.S.C. § 1951(b)(2). In the instant case, the district court, reading directly from the indictment, instructed the jury that the "extortionate conduct" charged against the defendants included "the causing of window installation companies to refuse to contract for the installation of Graham windows in New York City Housing Authority projects." Whatever it may be, this conduct was not extortion.

[40] I therefore dissent. A general guilty verdict must be overturned if one of the possible bases for conviction is legally, as contrasted with factually, insufficient. *United States v. Garcia,* 992 F.2d 409, 416 (2d Cir. 1993).

Copyright © 2005 Loislaw.com, Inc. All Rights Reserved